IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Affidavit in Support of Application Seizure Warrants

## INTRODUCTION

I, Debra L.LaPrevotte, after being duly sworn, depose and state as follows:

1.  I am a Special Agent employed by the Federal Bureau of Investigation ("FBI").  I have

been so employed for nine (9) years.  Currently, I am assigned to the Asset Forfeiture/Money

Laundering Squad in the FBI's Washington D.C. Field Division (Northern Virginia Resident

Agency).  My investigative assignments include money laundering as it relates to the proceeds of

bank fraud, wire fraud and mail fraud schemes,  as well as a variety of white collar

investigations.  I am currently assigned to work financial investigations of proceeds generated

from illegal activities, specifically money laundering violations of Title 18, United States Code,

Sections 1956 and 1957.    I have received extensive training in Advanced Money Laundering

Techniques and Complex Financial Manipulation.

2.  I am currently assisting Special Agent Robert Schwinger and Special Agent Thomas

Chadwick, FBI Washington Field Office.  Special Agent Schwinger and Special Agent Chadwick

conduct investigations involving Public Corruption.

3.  This affidavit is in support of an application for a seizure warrant for the following

bank accounts:

> a.  All monies and other things of value contained in Bank of America account
> No. xxxxxxxx2297, in the name of Antione Hudson;

> b.  All monies and other things of value contained in BB&T Bank account
> No. xxxxxxxx2138, in the name of A NU Properties;

> c.  All monies and other things of value contained in BB&T Bank account

No. xxxxxxxx1492, in the name of A NU Properties; and

d.  a 2003 Range Rover automobile, Maryland Tag ADD 545, VIN: SALMB11423A110042.

## **BACKGROUND**

4. In July 2003, the FBI began an investigation of District of Columbia Metropolitan Police Department (MPD) Officer, Joseph Wise (hereinafter "Wise).  Investigation revealed that Wise and Antione Hudson, (hereinafter "Hudson") were involved in a myriad of illegal activities. Specifically, the investigation has revealed evidence that Wise and Hudson were conspiring to and engaging in the interstate transportation and sale of stolen vehicles.  The investigation also revealed evidence that Wise and Hudson were conspiring to and engaging in insurance fraud.

5.  During the course of that criminal investigation, it was also learned that Hudson was, and still is, engaging in real estate fraud schemes to defraud individuals living in the D.C. metropolitan area of their homes.  In or around April 2005, a victim of Hudson's home theft scheme (hereinafter "P1") contacted the FBI and described how Hudson had stolen his/her home by forging official real estate documents and having those documents filed in the D.C. office of the Recorder of Deeds.

6.  This affidavit is based in part upon documents obtained in connection with this investigation, interviews, items seized during the execution of search warrants and other information gathered during the investigation.  The information contained herein is based on my personal knowledge and experience, and information provided to me by other law enforcement personnel who have participated in the investigation described in this affidavit.  This affidavit does not contain all of the information known to me regarding this investigation.  Your affiant

2

has included in this affidavit facts which she believes are sufficient to support a probable cause

finding for the issuance of the requested seizure warrants.

### INSURANCE FRAUD SCHEME

7.    On July 15, 2003,  an FBI Cooperating Witness (hereinafter known as CW1), reported

that CW1 knows Wise as an MPD officer whose nickname is "Bubby," and that Wise was a

participant in an insurance fraud scheme.  Wise told CW1 that he reported his Range Rover Sport

Utility Vehicle (SUV) stolen for insurance purposes, when he (Wise) had actually taken the

vehicle to a local chop shop where the vehicle was dismantled and sold for parts.  Thereafter,

Wise made a false clam to the insurance company that the vehicle was stolen and received from

the insurance company of $17,779.64.  Wise was arrested during the course of this investigation

and provides some of the information contained in this affidavit.

8.    Further investigation indicated that the chop shop was operated by Antione "Tony"

Hudson who sometimes lives at his father's residence at xxxxxxxxxxxxxxxxxxxxxxxxxx,

Washington, D.C.  Hudson's father at one time served as the President of the D.C. Real Estate

Appraisal Board.

9.    Wise described the stolen car/insurance fraud scheme to CW1 as follows.  Hudson's

chop shop steals high-end vehicles, such as Mercedes, BMW, Lexus, Cadillac, and Lincoln.

They also acquire salvaged or junked late model luxury vehicles.  The chop shop removes the

vehicle identification numbers (VINs) from the late model vehicles and applies those VINs to the

new, stolen vehicles.  The chop shop then resells the vehicles to their customers for $15,000.00

to $20,000.00 and instructs the customers not to take the vehicle to a dealership because the true

VIN of the stolen car could be discovered.  A customer is required to provide Hudson with a

3

$5,000 cash deposit is required; whereupon, the requested car is typically delivered to the customer approximately one week later, complete with Washington D.C. tags, title, and registration in the purchaser's true name.[1]  Upon delivery, the remaining $10,000 or $15,000 is due to the chop shop.

10.   After driving the vehicle for awhile, the purchaser returns the vehicle to the chop shop and reports the vehicle stolen to the purchaser's insurance company.  The purchaser subsequently fraudulently collects the insurance claim on the stolen vehicle based upon the true value of the vehicle which is substantially greater than the $15,000 or $20,000 paid for the vehicle.  Wise was heard on duly-authorized electronic intercepts telling CW1 how he (Wise) worked with Hudson and that the chop shop chopped his vehicle for parts, crushed the frame, and shipped it to a dumping ground where it would never be found.

### STOLEN VEHICLES SCHEME

11.   During a consensually recorded conversation on July 25, 2003, Wise offered to introduce CW1 to Hudson so CW1 could purchase a chopped vehicle.  Wise advised CW1 that CW1 would have to obtain auto insurance with a theft provision clause in order to benefit from the insurance fraud scheme.  Wise told CW1 to give him $5,000 to pay Hudson as a down payment on a chopped vehicle.  Wise told CW1 what types of cars Hudson had available.  For instance, on January 22, 2004, during a consensually recorded conversation, Wise advised CW1 that Hudson had a black 2004 Mercedes SL500 available and that the vehicle was worth $100,000.  Wise also advised CW1 that Hudson had located a Mercedes CL500 to steal the

---

[1]  The D.C. tags, title, and registration are illegally obtained through a contact at the D.C. Department of Motor Vehicles (DMV).

4

following week, but Hudson did not yet have the keys to that vehicle.  Wise also described for CW1 the transaction for the stolen Mercedes as follows:  Hudson would have the vehicle parked at a location of CW1's choice.  Wise would then get the $25,000 final payment from CW1 and deliver the money to Hudson. [2]  Hudson would give Wise the keys to the vehicle, and Wise would deliver the keys to CW1.  Wise and CW1 would then drive to where the stolen vehicle was located and drive it away.

12.  In late April, 2004, the FBI gave CW1 $10,000 to purchase a stolen vehicle from Hudson. CW1 gave these funds to Wise who went to the Remix Studio and took delivery of a stolen Mercedes Benz CLK-500 from Hudson.  CW1 was told that the vehicle was a silver Mercedes Benz CLK500 and that the price of the car had gone up anther $5,000 to $35,000 total. On the evening of April 26, 2004, Wise delivered the CLK 500 to CW1.   CW1 subsequently informed the FBI that the car had a D.C. license plate number of BW-3173.  Wise showed CW1 the D.C. registration card in the name of Delores T. Johnson, P.O. Box 2188, Oshkosh, Wisconsin, which Wise advised was the registration for the vehicle.   CW1 also provided the FBI with the Mercedes' VIN Number, WDBTJ75J53F046105.

13.  On April 27, 2004, FBI investigation revealed that the VIN on the CLK 500 in Wise's possession is a 2003 Mercedes Benz CLK500, black opal in color, that had been shipped from Germany to Baltimore, Maryland through Customs on or about February 28, 2002.  Manufacturer records reveal that this particular vehicle was offered for sale on or about September 5, 2003 in Evanston, Illinois, and had a mileage reading of 11,437.  On or about February 9, 2004, this VIN

---

[2] Wise had told CW1 that the price for the Mercedes had gone up to $30,000 because it was worth $100,000.

was reported as sold and a new title issued by the Illinois Motor Vehicle Department, title

number T4040616589, reported mileage 11,403.

14. On April 27, 2004, law enforcement official provided CW1 with $20,000.00 U.S.

cash (in recorded bills) to use for the purchase of the stolen silver Mercedes Benz CLK-500, VIN

WDBTJ75J53F046105, from Wise. At approximately 1:25 p.m., on that same date, Wise arrived

at CW1's residence, took the $20,000.00 from CW1, and gave CW1 the keys to the CLK 500.

The CLK-500 was processed by the FBI which revealed a piece of black cardboard containing

the "cloned" VIN from under the driver's side windshield, revealing the true VIN for the CLK-

500. The cloned VIN was WDBTJ75J53F046105; the true VIN which was revealed was

WDBTJ75J24F081959. Based upon the true VIN, the vehicle was identified as a CLK-500 that

had been reported as stolen from the HBL dealership in Vienna, Virginia on October 7, 2000.

15. On May 5, 20004, Wise was arrested by the agents of the FBI and agreed to

cooperate in its above-mentioned investigations.

## REAL ESTATE FRAUD SCHEME

16. As noted above, some time during April 2005, a victim of Hudson's home theft

scheme, "P1" contacted the FBI and described how Hudson had stolen his/her home by forging

official real estate documents. Hudson then filed those forged documents with the D.C. office of

the Recorder of Deeds. P1 met Hudson several years ago through mutual friends at a D.C. church

and learned that Hudson was involved in real estate.

17. Some time in 2001, P1's grandparents, who owned a residential property in

Washington D.C., (hereinafter known as "The Property") were having financial problems and

were in danger of losing The Property to foreclosure. To prevent foreclosure and to assist his

grandparents, P1 purchased The Property in 2002. To purchase the property, P1 obtained a mortgage for approximately $143,000.00. [3]

18. A series of events caused P1 to become delinquent in servicing the mortgage. To prevent foreclosure, P1 contacted Hudson to gain assistance in correcting his/her financial woes.

19. Shortly after P1 contacted Hudson, Hudson informed P1 that the mortgage payments on The Property were three (3) months in arrears. Hudson told P1 that The Property was about to go into foreclosure and therefore P1 needed to move quickly to avoid foreclosure and repair credit. When P1 asked Hudson how he was able to obtain all this information Hudson responded that he was able to get this information because he was in the real estate business.

20. During their discussion Hudson misleadingly explained the transaction to P1. Hudson advised that he would buy The Property from P1 for one year and make the mortgage payments which would improve P1's credit, although P1's name would remain on The Property. After one year, Hudson would sell The Property back to P1 for no more than $200,000.00. Hudson further falsely represented that he would pay off P1's debts, which included approximately $4,000.00 in commercial debt and a $13,000.00 car loan. Hudson told P1 that he (P1) would receive approximately $25,000 at closing/settlement which P1 could use to pay bills and get P1's finances in order. P1 agreed to the arrangement set forth by Hudson.

21. At a second meeting at Remix Studio, Hudson told P1 that his aunt, Venus Hill, had a mortgage brokerage business and would be handling all of the documentation for the

---

[3] Documents concerning this matter have been obtained from the D.C. Office of the Recorder of Deeds and have been reviewed by SA Chadwick and others investigating this case. Document No. xxxxxxx6376, filed on May 10, 2002, is a grant of deed detailing the purchase of The Property by P1 on May 1, 2002, for the sum of $143,000.00.

transaction.  At a third meeting with Hudson at the Remix Studio, Hudson told P1 that something

had to be done that day with regard to The Property or else P1 would lose it through foreclosure.

P1 told Hudson that P1 couldn't stay long because P1 had to get back to work.  Hudson advised

P1 that Hill was preparing the documents, but that it would be a while before he could get the

documents to P1 to sign.  Hudson told P1 that he could sign the documents for P1 when Hill sent

them over to the studio in order to get things moving and avoid foreclosure.  Hudson pulled out a

piece of white paper and told P1 to write and sign a statement authorizing Hudson to sign

documents relating to the transaction on P1's behalf.  Hudson told P1 to write something to the

effect of "I, P1, give Antione Hudson authority to sign documents relating to

xxxxxxxxxxxxxxxxx."  P1 wrote out the statement which was approximately two (2) lines and

signed the statement.

 22.  On May 5, 2004, Wise met Hudson at Hudson's girlfriend's residence located at

xxxxxxxxxxxxxxxxx, Upper Marlboro, Maryland and discussed Hudson's real estate schemes.

This conversation was recorded.  During the conversation Hudson described to Wise how his

scheme worked.  Hudson explained that people who are in a financial "bind" contact him for

help.  Hudson agrees to pay their bills for a year and give them some money.  He then goes to

settlement on their house and takes the money out of the property at settlement.  At the end of the

year Hudson tells the individual that if they want their house back they can buy it back, and if

not, it belongs to Hudson. Hudson goes on to say that the seller can't afford to buy the house back

from him because the house is worth considerably more than the seller knows when they sell it to

Hudson.  Hudson hides the value of the home from the seller by having them sign something so

that they don't ever see the HUD-1 form and learn the true value of their home.  Hudson

8

explained to Wise that he uses his own appraisal people and loan people and that Venus Hill is involved in the scheme. During the conversation, Hudson specifically referred to The Property owned by P1 and said that The Property appraised for $360,000.00 and that he was going to pull $300,000.00 out of The Property at settlement. He further explained that the payoff on The Property was approximately $138,000.00 and that he only paid $4000.00 to get the mortgage current and another $14,000.00 to cover the transfer and recording fees.

23. On or around May, 2004, Hudson told P1 to meet him at his bank parking lot so that P1 could sign something relating to the transaction. P1 met Hudson who was in possession of a check for approximately $138,000.00 that was made payable to P1. P1 could not recall the exact amount of the check. Hudson stated that P1 needed to endorse the check over to Hudson in order to go to settlement. P1 understood from Hudson that he would use the money to pay off P1's debt and go to settlement. P1 further understood from Hudson that he would provide P1 with $25,000.00 at settlement, as had been previously discussed. At that meeting, Hudson gave P1 $1,000 in cash to "have in pocket" until the $138,000.00 check cleared, which would take 11 days.

24. A review of Hudson's Bank of America account No. xxxxxxxx2297, reveals that on May 21, 2004, Hudson deposited a check for $142,641.11. This check appears to represent all of the proceeds due to the seller of xxxxxxxxxxxxxxxxx, NW, Washington, D.C. A review of public source data bases indicated that this property was sold to Antione Hudson on May 20, 2004 for a sale price of $340,000.00

25. On or around June 8, 2004, P1 met Hudson at the Remix Studio. Hudson wrote a check to P1, but folded it over so P1 couldn't see the amount. When Hudson handed P1 the

check, he told P1 that P1 would be getting more money later and that this check was just to allow P1 to pay some bills.  P1 opened the check and saw that it was for $6,500.00  Hudson had a number of people around him in the studio, so P1 did not want to ask Hudson about the rest of the money in front of other people.  The FBI has obtained a copy of this check which is drawn on the personal bank account of Hudson at Bank of America and lists an address for Hudson of xxxxxxxxxxxxxxxxx Washington D.C.    A review of Hudson's Bank of America account No. xxxxxxxx2297, reveals that on June 9, 2004, Hudson wrote check No.115 in the amount of $6,500.00

26.  At around this same time Hudson and Hill called P1 and told P1 that they needed P1 to fax them a copy of P1's photo identification (ID)  to Hill at Hill's office for settlement purposes.  Subsequent investigation revealed that Hill's office is located at xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx Silver Spring, Maryland.  P1 told Hudson that P1's ID was invalid; however, Hudson said that it was okay.  P1 faxed P1's ID to Hill's office as requested.  A few minutes later, P1 telephoned Hill at her office who told P1 that she had received the fax of P1's ID.  Hudson later told P1 that they changed some numbers on P1's ID, but that it was okay and that the transaction would still be completed.  P1 has stated that Hudson and Hill were both involved in changing the ID because they called P1 together to request the ID and Hudson used the term  "we" when stating that they had altered P1's ID.

27.  Over the next several months, P1 repeatedly called Hudson and asked him about when and where settlement would be.  Hudson repeatedly told P1 not to worry about it and that he would let P1 know when settlement would occur.  Hudson never told P1 when settlement would be and P1 never attended any settlement concerning this matter.

10

28.  P1 did not hear much from Hudson or Hill about the property until P1's grandfather saw in the newspaper an announcement in the Real Estate section that P1 had sold The Property to Hudson for $352,000.00  P1 was shocked, as it was not P1's  understanding that P1 would be making an outright sale and P1 had no idea that the property was worth that much money.

29.  Documents concerning this transaction have been obtained from the D.C. Office of the Recorder of Deeds and have been reviewed by Special Agent Chadwick and others investigating this case.  Document No. 2004081562 is a grant of deed, filed on June 10, 2004, detailing the transfer of ownership (grant of deed) for The Property from P1 to Antione Hudson for the sum of $340,000.00.  The document is notarized by Michael A. Friedman, Old Line Title & Escrow, LLC, xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx, Baltimore, MD 21208, who certifies in the deed that P1 is personally well known to Friedman and appeared before him to execute the grant of deed.  P1 has reviewed this document and advised that he/she has never met Michael A. Friedman and that the signature on the grant of deed is a forgery.  Special Agent Chadwick has reviewed other official documents signed by P1 and P1's signature on these official documents is not consistent with the signature on the D.C. Recorder of Deeds document transferring ownership to Hudson.  P1 has stated that the only document ever signed by P1 was the two line statement described in section No. 47 of this affidavit.  Notably, P1 was never paid $340,000 for the sale of P1's home.

30.  P1 repeatedly asked Hudson for a copy of all documents that Hudson signed on P1's behalf relating to the property, including the Federal HUD 1.  Hudson advised P1 that all of the documents were housed with Hill at Hill's mortgage company office and that P1 should call Hill. P1 called Hill on numerous occasions and asked to get copies of the documents and the HUD 1.

Hill always had an excuse about why she couldn't send P1 the documents. After P1 asked Hill specifically for the HUD 1 form, Hill stopped returning P1's calls.

31. P1 has repeatedly asked Hudson for a copy of the hand written statement that P1 made at the Remix Studio, as well as the settlement documents. Hudson has not provided P1 with these documents.

32. Despite Hudson's representation that he would pay off P1's vehicle note, P1 started receiving notices that P1's car payments were due. P1 called Hudson to ask why the car loan wasn't paid off. Hudson replied that he didn't need to pay off P1's car loan to improve P1's credit, he only needed to get P1's car payments current. The only moneys ever received from Hudson by P1 were a check for $6,500, $1,000 cash, and two car payments made on P1's behalf.

33. After P1 learned in the newspaper that Hudson had bought The Property for $352,000.00 P1 telephoned Michelle (Last Name Unknown), one of Hudson's employees, and told her that P1 had someone else on the phone who knew something about real estate. Hudson called P1 on P1's cell phone and said, "look shorty you had better think about what you are doing before you do it." P1 asked Hudson what he meant by that and he repeated the statement. P1 interpreted this statement as a threat, and was upset.

34. In early May, 2005, P1 received a letter dated May 2, 2005 from Naomi Brown on letterhead for A NU PROPERTIES, INC., xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx, Washington D.C. 20005, telephone (301) 523-0986, fax (301) 576-3761, toll free telephone (800) 511-4638. The letter stated that P1's "Equity Assistance Agreement" would end on May 20, 2005, and that based on an "End of Agreement Notification" dated April 6, 2005, P1 had to decide whether to purchase or lease The Property by May 1, 2005. The letter continued stating that since P1 had

12

not provided notification of intent by May 1, 2005, A Nu Properties was enclosing a lease for all occupants of the property to sign. Under the terms of the lease, P1 is required to pay $1,700 per month rent or be subject to eviction if the rent is not received by the 10th of the month.

35.  Prior to receiving this letter, P1 had never heard of A Nu Properties, and knew nothing about an Equity Assistance Agreement or an End of Agreement Notification.  P1 had never signed any documents with A Nu Properties or Hudson other than the two-line hand written statement that P1 wrote at the Remix Studio.  Based upon Hudson's statements, P1 thought that P1 could buy the house back from Hudson after one year for approximately $200,000.  P1 also knew nothing about being required to rent the property from Hudson.

36.  P1 has continued to ask Brown and Hudson for copies of all of the settlement documents for The Property, including the HUD-1.  At about the time when P1 received the lease in the mail, Brown provided P1 with a typed list of the bills that were allegedly paid off for P1, as well as two pages of the HUD-1.  The pages of the HUD-1 that P1 received did not include the signature page.  P1 does not know whether the bills listed on the page provided by Brown were actually paid off.

37.  On June 6, 2005, Hudson called P1 and left a message stating that he needed to know if P1 was planning to lease The Property or move out. Approximately one (1) week later, Brown visited The Property and told P1's grandfather and other family members that they needed to sign a lease or be evicted.

38.  On June 14, 2005, P1 participated in a consensually recorded telephone conversation with Naomi Brown.  Brown told P1 that if the rent wasn't paid, P1's grandfather would be evicted.

39. On June 14, 2005, P1 participated in a consensually recorded telephone conversation with Hudson. Hudson stated that if the rent wasn't paid that he would evict P1's grandfather. Hudson further stated that if P1 wanted to buy The Property back, that it would cost over $300,000.

40. A business card for Naomi Brown, M.B.A, of A NU Properties Inc., xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx, Washington D.C. 20005, advertises that A NU Properties Inc. provides the following services: Bankruptcy Assistance, Credit Repair, Equity Assistance, and Foreclosure Assistance. On June 17, 2005, Special Agent Chadwick visited this location and determined that it is a United Parcel Service (UPS) store and that No. 113 is a mail box. It is your affiant's experience that individuals involved in criminal acts often attempt to conceal the true location of their operations by using post offices boxes that appear to be physical addresses.

41. D.C. corporation records indicate that A NU Properties Inc., is registered to Antoine Hudson at xxxxxxxxxxxxxxxxxxxxxxxxxxxx, Washington D.C.

42. Providing materially false information on a loan or credit application, to include forged signatures is a violation of Title 18 U.S.C. § 1014 (Loan Credit Application Fraud). and the electronic transmission and mailing of these false loan documents to the lending institutions constitutes violations of Title 18, U.S.C. § 1343, Wire Fraud and Title 18 U.S.C. §1341 (Mail Fraud).

## ADDITIONAL PROPERTIES OBTAINED BY FRAUD

43. During the course of this investigation, Special Agent Schwinger and Special Agent Chadwick identified other victims who appear to have been defrauded out of their homes by

Hudson through his business, A NU Properties.  Special Agent Schwinger interviewed

Gwendolyn Jones who informed him that in early 2005, she was the owner of a parcel of real

property located at xxxxxxxxxxxxxxxxxxxxxxx, Washington, D.C.  Jones had filed for

bankruptcy and was afraid of losing her home to foreclosure.  Jones was referred to A Nu

Properties by a friend.  John Dixon, from A NU, met with Jones and explained that she could sell

her home to A NU, continue to live at the residence, and then perhaps purchase her property back

from A NU once her credit had improved.  Dixon told Jones that she could buy back for

$238,000.00, the same price she was selling it to A NU.   Based on the statements made by

Dixon, Jones signed an agreement with Dixon stating that she could buy back the property in

twenty-four months.  On this agreement, Jones crossed out the words, "fair market value", and

placed her initials next to the crossed out words, and then signed the agreement.  Jones stated that

she had crossed out the words "fair market value" because she was told that she could purchase

the residence back for the $238,000.00 sale price for which she was selling it.  Jones has

requested a copy of this document from A NU and has not been provided with a  copy.

    44.  Dixon told Jones that A NU would receive a flat $10,000.00 fee, plus the closing

costs for the sale at the time that the agreement was executed; and the prepaid closing costs for

the sale back to Jones in the future.  Jones was aware that A NU received $60,000.00 from the

sale of the property at closing, but Jones was told by the settlement agent that the $60,000.00

represented the $10,000.00 flat fee and the closing costs due to A NU.  At closing, Jones received

a check for $12,000.00 to fix up the residence.  Jones was shown a copy of a settlement escrow

statement that is present in the settlement file for the sale of this property, that authorizes

$60,000.00 to be paid to A NU.  There is a signature on this document that bears the name

Gwendolyn Jones. Jones stated that she did not sign that document, and that she believed the signature on that document was forged. Jones is currently living at the residence and is paying monthly rent to A NU Properties. A review of Hudson's A NU Properties BB&T Bank account No. xxxxxxxx1492 reveals that on May 19, 2005 there was a deposit of $61,189.71 into that account. This is the same amount (for the sale of Jones' LeBaum street property) that was written on the HUD-1 that was found during the search of Hudson's business.

45. Special Agent Schwinger also interviewed Betty Ames, the owner of xxxxxxxxxxxxxxxxxxxxxxxx, Washington, D.C. In February, 2005, Ames wanted to refinance her home and pay off some debts and set aside some money for her son to go to college. Ames was referred to John Dixon of A NU by friends. Dixon came to Ames' house and told Ames that he could refinance her home if she sold the house to A NU Properties. Dixon told Ames that if she sold her home to A NU, they would refinance the house, give Ames some money and pay Ames' bills. At this time, Ames believed her debt was approximately $40,000.00 Ames signed an agreement with Dixon that indicated that she would receive $62,500.00 for the sale of her home. The agreement signed by Ames indicated that the buyer was A NU Properties. Ames was told that she would be able to purchase the property back from A NU for the amount of A Nu Properties' closing costs, $10,000.00 to $15,000.00 At settlement, Ames had expected to receive $62,500.00 based on her written agreement with Dixon, but Ames received only $15,000.00. Ames was told that they could not give her any more money because A NU would be paying off her $40,000 of debt, and that the remaining funds would cover the closing costs. Ames was told by Dixon that the house had been appraised for $167,000.00. Special Agent Schwinger showed Ames the HUD-1 statement that was in the settlement file associated with the sale of this

16

property.  The HUD-1 form indicated that the house had been appraised at $211,000.00  Ames

stated that she believed that she was selling her residence to A NU for $167,000.00; and that her

name would remain on the deed.  The settlement file showed that the buyer of Ames home was

Tamika Canty.  Ames does not know Canty and did not know she was the "buyer" until Ames

began receiving mail for Canty at her residence.  Special Agent Schwinger showed Ames an

escrow statement from the mortgage file which authorized A NU Properties to receive

$82,182.27 at closing from the sale proceeds.  Ames stated that she had never seen that document

and that she did not sign the document.  Ames advised that she would never have agreed to turn

over that much money without asking questions.  Ames stated that the copy of the sales contract

that she was shown indicated that A NU Properties was the "buyer" of her property.  The sales

contract that was included in the loan file showed that Tamika Canty was the "buyer."  Ames

reiterated that she did not sign the sales contract that bears Canty's name as "buyer", and believed

the signature is a forgery.  A review of the A NU Properties BB&T Bank account No.

xxxxxxxx2138, reveals that on March 29, 2005 Hudson deposited $82,132.27 into this account.

This check matches the amount due to the seller at closing which ended up going to A NU

Properties.

    46.    On or about October 12, 2004, Sterling Watts purchased the property located at

xxxxxxxxxxxxxxxxxxxxxxxxx, Washington, D.C., from the father of Watts' girlfriend, Patricia

Patton, for $625,000.00 Patton did not have good credit and Watts was purchasing this house in

his name as a favor to Patton, who wanted to purchase the property from her father.  Soon

thereafter, Watts and Patton broke up and Watts agreed to sell the property back to Patton for the

price they had agreed on, $670,000. 00.  Patton contacted A NU Properties and set up a

17

settlement for the sale of the property. Watts showed up at settlement and the purchase

document indicated that he was selling the house to Gretha Jenkins and the HUD-1 indicated that

Watts would be receiving a lot of money for the sale of the property. Watts was concerned

because he did not know Gretha Jenkins, she was not present at closing, and he did not expect to

get any money back for the sale of the property. Watts asked about the large amount of money

noted on the HUD-1 as due to seller, and he was informed that he should just endorse the check

over to Patricia Patton. Watts informed Special Agent Schwinger that he did not feel

comfortable with this arrangement and he refused to sign the closing documents and left the

settlement.

47. On April 27, 2005, Patton arranged for a second settlement through Venus Hill. This

time, Watts was shown a HUD-1 form and told that the sale price of the house was the agreed

upon amount of $670,000.00 and cash due to seller was 0. There were other amounts listed on

the HUD-1, but Watts was told that Patton was taking out a second trust to make repairs on the

home. Watts did sign these closing documents and sold the house. Watts added that again the

agreement indicated that the buyer was Gretha Jenkins, and Jenkins was not present at

settlement. Patton told Watts that Jenkins was her friend. Watts reiterated that he signed the

closing documents because he thought that the sale price was $670,000.00 and the money due to

the seller was 0.

48. Two weeks later, Watts received a fax from Venus Hill on A NU Properties

letterhead of an escrow agreement which needed Watts signature. This escrow agreement was

authorizing the payment of $171,318.58 to A NU Properties. Watts asked why was he still being

asked to sign documents if the sale was final. Hill advised that his signature was just needed to

"close out the file." Watts refused to sign. He did not understand why A NU Properties would be paid $171,318.58 and did not know where the money was coming from. Watts reviewed the HUD-1 provided by Hill and realized that the sale price of the house was not $670,000.00 but was actually $838,000.00.

49. Watts informed the FBI that he began receiving phone calls from Venus Hill and Naomi Brown from A NU pressuring Watts to sign the document. Patricia Patton called Watts and informed him that the $171,318.58 was going to be held in escrow for her by A NU to make repairs on the house. Watts subsequently met with Patton, who provided a second Escrow Statement and Agreement that stated Watts would not be responsible for capital gains taxes. Watts stated that he signed the documents because Patton told him it was okay and that the money would be used on her home. Special Agent Schwinger showed Watts the Escrow Statement that was in the mortgage file. Watts stated that the signature on the Escrow Statement was not his signature and the form was different from the one he signed when meeting with Patton. The Escrow Statement in the file was also different from the form that was faxed to him by Hill, which Watts refused to sign. Watts also stated that he had never seen the two sales contracts that were in the settlement files which listed Gretha Jenkins and Curtis Jordan as the "buyers" and listed the sale price as $838,000.00, nor did Watts sign these documents.

50. Your affiant reviewed the settlement file for xxxxxxxxxxxxxxxxxxxxx, Washington D.C. and the A NU Properties BB&T Bank account No. xxxxxxxx1492 which indicated a deposit on May 4, 2005, in the amount of $180,550. The settlement file contains a check stub for a check to A NU Properties dated April 28, 2005 in the amount of $171,318.58. There is,

therefore, probable cause to believe that this deposit to the BB&T account on May 4, 2005

represents the proceeds of the sale of this property deposited along with other funds.

51.  Special Agent Schwinger and Special Agent Chadwick have identified in excess of

18 properties that Hudson, A NU Properties and their associates have purchased in the past 15

months.

## BANK ACCOUNTS and VEHICLES

52.  Your affiant reviewed bank records for Hudson's Bank of America account No.

xxxxxxxx2297 from the date that it was opened on April 27, 2004 through May 18, 2005.  This

account is solely in the name of Antione Hudson.  On May 21, 2004, Hudson deposited a check

in the amount of $142,461.11.  This is the check that was due to P1, from the sale of the property

located at xxxxxxxxxxxxxxxx, NW, Washington DC.

53.  It was from these funds and the limited addition of other smaller deposits that

Hudson has made 12 payments on his 2003 Range Rover, Maryland Tag ADD 545, VIN:

SALMB11423A110042.  Following the large deposit mentioned above, Hudson made a first

payment of $823.01 on June 16, 2004, which was followed by 11 more monthly payments of

$825.81 to Land Rover, for a total of $9,906.92.  Investigation reveals that Hudson purchased the

Range Rover on or about August 14, 2002 for a purchase price of $72,045.00.   Hudson appears

to have put $21,015.81 down at the time of purchase and financed out the remaining funds.

## LEGITIMATE INCOME

54.  Your affiant has reviewed bank records for Hudson from Bank of America covering

the past 13 months.  The majority of deposits into Hudson's account appear to be from the fraud

associated with property deals, or cash deposits which may be related to Hudson's involvement in insurance fraud and the sale of stolen vehicles.

55.  Further, your affiant has reviewed tax records recovered from Hudson's residence during a search warrant executed on June 29, 2005.  The gross income listed for Hudson on his personal income tax returns for 2002, 2003 and 2004 are as follows:

| | |
|------|---------|
| 2002 | $12,660 |
| 2003 | $23,336 |
| 2004 | $14,128 |

56.  Your affiant has reviewed loan applications completed by Venus Hill on behalf of Hudson for mortgage loans to purchase properties using the above described scheme.  On May 20, 2004, a loan application for Hudson to purchase the property described in this Affidavit as xxxxxxxxxxxxxxxxx, NW, Washington D.C., listed Hudson's employer as The Remix Studio, and his monthly gross income as $8,563.00, for a total gross annual income of $102,756.00.  On December 21, 2004, a loan application for Hudson to purchase xxxxxxxxxxxxxxxxx, Capitol Heights, Maryland listed Hudson's employer as The Remix Studio, and his monthly gross income as $15,822.00, for a total gross annual income of $189,864.00.  On June 9, 2005,  a loan application for Hudson to refinance xxxxxxxxxxxxxxxxx, NW, Washington D.C., listed Hudson's employer as A NU Properties, and his monthly gross income as $20,000.00, for a total gross annual income of $240,000.00.

## CONCLUSION

57.  Based upon the evidence contained in this affidavit there is probable cause to believe that Antione "Tony" Hudson is involved in schemes to commit the following offenses: Loan Credit Application Fraud, (in violation of 18 U.S.C. § 1014); Mail Fraud (in violation of Title 18,

U.S.C. § 1341), and Wire Fraud (in violation of Title 18 U.S.C. § 1343). There is also probable cause to believe that the funds currently on deposit at Bank of America account No. xxxxxxxx2297, and BB&T account Nos. xxxxxxxx2138 and xxxxxxxx1492, are the proceeds of these schemes. Lastly, there is probable cause to believe that the funds contained in the bank accounts described above, as well as the funds used to purchase and or to make monthly payments on the 2003 Range Rover, Maryland Tag ADD 545, VIN: SALMB11423A110042, are subject to forfeiture pursuant to Title 18, U.S.C. §§ 981 (a)(1)(A), (C).

Wherefore, I request the issuance of seizure warrants for the following items:

a. All monies and other things of value in Bank of America account No. xxxxxxxx2297, in the name of Antione Hudson;

b. All monies and other things of value in BB&T Bank account No. xxxxxxxx2138, in the name of A NU Properties;

c. All monies and other things of value in BB&T Bank account No. xxxxxxxx1492, in the name of A NU Properties;

d. 2003 Range Rover, Maryland Tag ADD 545, VIN: SALMB11423A110042.

FURTHER THIS AFFIANT SAYETH NOT.

_____
Debra L. LaPrevotte
Special Agent, FBI

Subscribed to and sworn before me on this 22nd day of July, 2005.

_____

United States Magistrate Judge